# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 29, 2013

## PHILLIP DOUGLAS SEALS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Anderson County**
**No. B0C00570      Donald R. Elledge, Judge**

---

**No. E2012-00702-CCA-R3-PC-FILED-MARCH 21, 2013**

---

The petitioner, Phillip Douglas Seals, appeals the post-conviction court's denial of his petition for post-conviction relief from his two first degree murder convictions. On appeal, he argues that: (1) he received the ineffective assistance of counsel and (2) the post-conviction court erred in denying his request for transcripts of the opening and closing statements so he could determine whether the original prosecutor engaged in prosecutorial misconduct. After review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Leslie Richard Hunt, Clinton, Tennessee, for the appellant, Phillip Douglas Seals.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; David S. Clark, District Attorney General; and Sandra N. C. Donaghy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The petitioner was convicted of two counts of premeditated first degree murder and two counts of felony murder, arising out of the shooting of the petitioner's estranged wife and her male friend. State v. Phillip Douglas Seals, No. E2007-02332-CCA-R3-CD, 2009 WL 55914, at *1 (Tenn. Crim. App. Jan. 9, 2009), perm. app. denied (Tenn. May 26, 2009). The trial court merged the felony murder convictions into the premeditated first degree murder convictions and sentenced the petitioner to concurrent life sentences. His

convictions were affirmed on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. Id.

The underlying facts of the case were recited by this court on direct appeal as follows:

[The petitioner] was married to one of the victims, Misty Dawn Seals. When they married in 1997, they lived in a home on Heiskell Road in Heiskell, Tennessee. Sometime in 2000, [the petitioner] and Mrs. Seals took custody of two foster children, Dustyn and Ashley. At the time the children moved in, Dustyn was nine years of age and Ashley was around twelve years of age. [The petitioner] and his wife adopted the children approximately one year later. They all lived together in the house on Heiskell Road until January of 2005, when Mrs. Seals and the children moved into the Willow Run Apartments in Clinton, Tennessee.

On February 24, 2005, Mrs. Seals and her friend, Mark Newton, were found shot to death inside the Willow Run apartment. [The petitioner] was arrested and later indicted by the Anderson County Grand Jury for two counts of first degree murder and two counts of felony murder.

At trial, the following evidence was presented. Clinton Police Officer Sean Cusic was dispatched to Willow Run Apartments on February 24, 2005, to investigate a possible domestic situation. When Officer Cusic arrived at the apartment at around 10:40 a.m., no one answered the door. Detective Vaughn Becker soon arrived on the scene, and both officers entered the residence.

Detective Becker entered the apartment and noticed that there was a chain lock on the front door that was connected to the molding on the side of the door. The part of the door holding the chain lock had been broken off and was lying in the floor inside the apartment. As he made his way through the apartment, he also noticed that the bedroom door had been kicked in and the door frame had become separated from the drywall. When Detective Becker entered the bedroom at the end of the hallway, he discovered the bodies of Mrs. Seals and Mr. Newton. Neither person was wearing clothing. Mrs. Seals was lying on her back and Mr. Newton was lying on his left side. Detective Becker was able to see that each of the victims had several bullet holes in their body. Underneath a chair in the bedroom, Detective Becker located a loaded forty-caliber semi-automatic pistol. The officers also found other firearms, including a nine-millimeter pistol, a twenty-two rifle, and a twenty-two pistol.

The officers determined that there was not a suspect in the vicinity and called emergency medical personnel. When medical personnel arrived on the scene, they confirmed that the victims were dead.

Dr. Cleland Blake performed the autopsies on the victims. Mrs. Seals had multiple forty-five caliber gunshot wounds, one to the center of her chest, one to her abdomen, and one to her left arm. The chest wound disrupted the left ventricle of the heart, killing her within a few minutes. Mr. Newton had five gunshot wounds. One of the gunshot wounds was a deadly wound on the right front of the chest that perforated the aorta. There were also four entry wounds in Mr. Newton's back.

Don Carman, a forensic scientist with the Tennessee Bureau of Investigation Crime Lab examined the nine cartridges that were recovered from the crime scene and was able to determine that they were all fired from the same weapon. The weapon that was used in the crimes was not recovered, but Mr. Carman stated that a forty-five caliber semi-automatic pistol would fire the shells that he examined.

According to James Burns, the manager of Charlie's Super Pawn Shop, [the petitioner] purchased a Charles Daly forty-five caliber handgun on December 4, 2002. [The petitioner]'s children testified that there were several guns in their house and that the entire family often went to the shooting range together.

On the morning of the incident, between 9:00 a.m. and 10:00 a.m., Patricia Kreis arose for the day. Mrs. Kreis lived directly across the apartment complex from Mrs. Seals in apartment 284 at Willow Run Apartments. Mrs. Kreis peered out of her blinds, as she did every morning when she woke up. When she looked outside, Mrs. Kreis saw [the petitioner] standing at the door of Mrs. Seals apartment. [The petitioner] looked to the left and right, then opened the door and went inside. Mrs. Kreis did not see [the petitioner] use a key to enter the apartment.

[The petitioner]'s brother, Luther Steven Seals ("Steven"), was attending paramedic training on February 24, 2005. At some point that day, Steven received a call from [the petitioner]. [The petitioner] wanted to know if Steven had gotten the message that he left earlier that day. Steven listened to the voice message in which he heard [the petitioner] state that he had "shot them." Steven immediately called [the petitioner] back and asked him what

he had done. [The petitioner] informed his brother that he had forced his way into Mrs. Seals apartment and had caught "them" in bed having sex. [The petitioner] threatened Steven, telling him that if Steven contacted the police, [the petitioner] would shoot himself. [The petitioner] asked Steven to pick up his children. [The petitioner] told Steven that he was going to go to Kentucky to create an alibi.

According to Ashley and Dustyn Seals, there were no marital problems between their parents until her mother started spending time with Mr. Newton. Around Christmas of 2004, Dustyn and his sister met Mr. Newton. According to Dustyn, he and his sister had already surmised that their mother was seeing another man.

Ashley remembered that on January 26, 2005, she was awaked between 2:00 a.m. and 3:00 a.m. by the sound [of her] mother crying. Ashley heard [the petitioner] claim that he had a suicide note. Ashley thought that the argument was about Mrs. Seals's refusal to give [the petitioner] the password to her second cell phone. Ashley called 911. When the police came, Mrs. Seals, the children, and the pets left the family home. This incident precipitated the separation of [the petitioner] and Mrs. Seals. After the incident, Mrs. Seals and the children spent several days in a hotel before moving into the Willow Run Apartments.

Officer Ken Campbell responded to the call about a possible domestic situation on January 26. When he arrived, Mrs. Seals was very upset. She claimed that she was having marital problems and that [the petitioner] pulled a gun on her during an argument. [The petitioner] informed the officer that he found out that day that his wife had rented an apartment and was seeing someone else. [The petitioner] was not taken into custody at that time because [the petitioner] denied possessing a weapon, denied threatening Mrs. Seals, and there were no physical signs to support her statement.

Robert Byrd, the director of Emergency Services for Anderson County, was [the petitioner]'s employer beginning in 1999. According to Mr. Byrd, [the petitioner] came into the office in January of 2005, and was upset about the altercation that had occurred between him and Mrs. Seals. [The petitioner] told Mr. Byrd that all of Mrs. Seals's accusations were lies. [The petitioner] admitted that an argument had taken place but claimed that there was no gun involved. Several weeks later, however, [the petitioner] approached Mr. Byrd and told him that he had lied about the altercation with Mrs. Seals. During

this conversation, [the petitioner] admitted that he had a gun and that he had threatened his wife. Mr. Byrd ordered that [the petitioner] attend counseling.

After the couple separated, Ashley and Dustyn continued to visit occasionally with their father. When Dustyn stayed with [the petitioner], he knew that Mr. Newton stayed with Mrs. Seals at the apartment. Dustyn remembered his mother asking him not to tell [the petitioner] about Mr. Newton. Ashley remembered that [the petitioner] took her out to dinner around Valentine's Day and that she and Dustyn went to North Carolina with [the petitioner] for a few days. [The petitioner] spent at least one night at the Willow Run apartment after the couple separated, around February 13, 2005. Ashley thought that was the same day that her mother took [the petitioner] to the hospital. About two weeks prior to his mother's death, Dustyn accompanied [the petitioner] to a hunting expo. [The petitioner] was looking for scopes and silencers for an HK weapon. [The petitioner] purchased a scope at the expo. Neither Ashley nor Dustyn remembered problems between [the petitioner] and their mother before Mr. Newton became a part of their mother's life.

On February 6, 2005, Elsie Fine was at Saint Mary's Hospital in Knoxville, Tennessee. Her daughter was a patient at the hospital. Ms. Fine saw Mrs. Seals in the parking lot talking with [the petitioner]. Ms. Fine recognized Mrs. Seals as one of the nurses who had worked with her disabled daughter. Ms. Fine approached Mrs. Seals to speak with her when she heard [the petitioner] tell Mrs. Seals, "I'm going to kill you if it's the last thing I ever do." Ms. Fine did not stop to talk to Mrs. Seals, instead proceeding to her truck. When Ms. Fine returned to the hospital, the couple was gone. Ms. Fine later saw Mrs. Seals with tears on her face.

Sherry Morrell worked with Mrs. Seals as a nurse at NHC in Oak Ridge. On February 15, 2005, Ms. Morrell saw Mrs. Seals remove several guns from her car and give them to [the petitioner]'s brother.

Prior to her death, Mrs. Seals hired attorney Robert Olive to represent her in a divorce action against [the petitioner]. He sent a letter and summons to [the petitioner] on February 23, 2005, the day prior to the victims' death, to notify [the petitioner] that Mrs. Seals wanted a divorce.

Dustyn spent the night with [the petitioner] on February 23, 2005. Around 4:00 a.m., [the petitioner] woke Dustyn up and informed him that he

was leaving for work. [The petitioner] worked as a paramedic for Anderson County and also as a flight paramedic for an air ambulance company called LifeNet Medical Services that was based in London, Kentucky. [The petitioner] was originally scheduled to work for LifeNet on February 24, 2005, but he had requested to be off that day during his last shift on either February 19 or 20, 2005. Dustyn found out about his mother's death around noon on February 24, 2005.

On the morning of February 24, 2005, Mrs. Seals drove Ashley to school. They left through the front door of the apartment. According to Ashley, there was no damage to the front door or her mother's bedroom door at that time.

Chuck Peters was working in the Clinton, Tennessee, 911 Communications Center when a call came in on February 24, 2005, to report a domestic altercation at 262 Willow Run Apartments. The caller reported that an ambulance was needed. Gary Davis, an employee of Anderson County Emergency Medical Service, had worked with [the petitioner] since 1999. He stated that the voice on the 911 recording sounded like [the petitioner]'s voice.

After [the petitioner] was arrested, Officer Becker obtained a search warrant for the Heiskell Road residence. There officers located two firearms, neither of which was a forty-five caliber weapon. Officer Becker did locate a receipt for the purchase of forty-five caliber ammunition from Wal-Mart in Jacksboro, Tennessee, dated January 28, 2005. Officer Becker also collected nine forty-five caliber shell casings from a field near [the petitioner]'s residence that had been used as a shooting range. According to Donald Carman from the TBI Crime Laboratory, the cartridge cases that came from the crime scene and the cartridge cases recovered from the firing range near [the petitioner]'s home appeared to have been fired from the same forty-five caliber pistol. The rifling on the bullets was consistent with the barrel characteristics of pistols made by Charles Daly, Eagle Arms, and Star firearms manufacturers. None of the shell casings found at [the petitioner]'s residence were exactly like those found on the firing range.

The State introduced proof at trial to show that prior to the victims' deaths, [the petitioner] had hired Pinnacle Investigations to conduct surveillance on his wife and a suspected boyfriend. Pinnacle Investigations conducted surveillance on Mrs. Seals between February 4 and 21, 2005, for a total of approximately eleven hours. [The petitioner] was given a verbal

report of the findings of the surveillance.

[The petitioner] offered proof at trial in his own behalf. Dr. William Bernet, a psychiatrist at Vanderbilt School of Medicine conducted a pretrial forensic psychiatric evaluation of [the petitioner] in June of 2006. Dr. Bernet's primary diagnosis of [the petitioner] was adjustment disorder with depressed mood or, in other words, a mild form of depression. Dr. Bernet opined that [the petitioner] had stressors in his life at the time of the victims' deaths. Specifically, Dr. Bernet stated that [the petitioner]'s job was stressful and that [the petitioner] was having serious relationship problems with his wife. Dr. Bernet also arranged for psychological and neurological testing through Dr. James Walker.

According to Dr. Bernet, [the petitioner] was moderately impaired in functioning in relationships at home and with his wife. At the time of the offense, [the petitioner] probably had difficulties with judgment and rationalization. [The petitioner]'s ability to cope with stress was impaired by his depression and anxiety. [The petitioner] was also experiencing a high level of paranoia, but Dr. Bernet did not render a medical diagnosis in regard to the paranoia experienced by [the petitioner]. Dr. Bernet felt that [the petitioner]'s ability to premeditate a "crime like this" would have been impaired "to some extent," probably rising to the level of "significant" impairment of judgment and [the petitioner]'s ability to "think things through."

The State called Dr. Mark Castelini, the chief psychologist at Ridgeview Psychiatric Center, to rebutt Dr. Bernet's testimony. Dr. Castelini testified that [the petitioner] was competent to stand trial and that the diagnosis of adjustment disorder with depressed mood usually resolved itself within six months of the stressor causing the mental illness.

[The petitioner] took the stand at trial. [The petitioner] described his marriage as good until October or November of 2004, when he discovered Mrs. Seals was at another man's apartment. Mrs. Seals had told [the petitioner] that she was going to stay at a hotel to get away for a little while.

[The petitioner] testified that the January 26, 2005 incident was initiated after he discovered that Mrs. Seals was in possession of a cell phone that she told [the petitioner] she no longer had. [The petitioner] claimed that there was no physical altercation at that time. After this incident, Mrs. Seals

got the apartment.

[The petitioner] denied being at Saint Mary's Hospital on February 6, 2005. [The petitioner] testified that he was working for the Campbell County Emergency Medical Service that day. On February 13, 2005, [the petitioner] took Mrs. Seals out for ice cream. [The petitioner] took Mrs. Seals out to dinner on Valentine's Day.[1] [The petitioner] stated that he was not feeling well, and Mrs. Seals insisted on taking him to the Emergency Room at Methodist Medical Center in Oak Ridge, where he received a prescription for Ativan.

He admitted that he went to Mrs. Seals's apartment on February 24, 2005, between 9:30 and 10:00 a.m. to pick her up. The two were supposed to go to Kentucky together so that [the petitioner] could turn in his uniform to LifeNet. [The petitioner] had recently resigned from his full-time position to take a part-time position so that he could be closer to his family. At that time, [the petitioner] was aware that Mrs. Seals was planning to file for divorce.

[The petitioner] opened the door to the apartment with the key he had been given by Mrs. Seals. [The petitioner] stated that he did not see . . . Mrs. Seals, so he walked toward her bedroom. He heard voices mumbling in the bedroom. [The petitioner] kicked in the bedroom door and saw Mrs. Seals and another man naked in bed. [The petitioner] stated that he picked up a forty-five caliber pistol that was on the bench at the foot of the bed and started shooting in the direction of the moving man. He thought that the man was going for a weapon even though he did not see one in the area. [The petitioner] stated that one of the bullets struck the man and that [the petitioner] continued to fire the weapon at the man until he fell to the floor. Mrs. Seals was on the left side of [the petitioner] and started to walk toward him with her arms up. [The petitioner] fired the pistol at Mrs. Seals, striking her. [The petitioner] then left the apartment, drove to a gas station, and called 911.

[The petitioner] then drove through Lake City, Tennessee, to Norris Dam and threw the pistol into the water. He considered jumping into the lake. [The petitioner] then got back into his car and drove home. [The petitioner]

---

[1] During rebuttal proof, the State called Ashley to the stand who testified that [the petitioner] took her to Chili's restaurant and to get her nails done on Valentine's Day.

then called his brother to tell him what he had done.

Id. at *1-6.

On June 3, 2010, the petitioner filed a *pro se* petition for post-conviction relief, in which he alleged various allegations of ineffective assistance of counsel as well as prosecutorial misconduct. The post-conviction court conducted an evidentiary hearing on January 23, 2012.

At the hearing, the petitioner testified[2] that trial counsel was not diligent in producing the petitioner's bank records at trial. He claimed that the records would have shown that he was not in Tennessee on February 6, 2005, the date one of the State's key witnesses testified that "she heard [him] make an accusation." He said that he was actually at a service station in North Carolina at the time the witness said she saw the petitioner and the victim together. He stated that he first had access to the bank records after his appeal and that he and counsel did not discuss the bank records before trial because counsel never asked about his bank records. He admitted that he could not "recollect actually mentioning bank records [to counsel] because [he] had so much on [his] mind at the time." However, the issue was raised in his motion for new trial because he brought it up when they were preparing for the motion. He suggested that counsel subpoena his bank records. On cross-examination, the petitioner acknowledged that he did not mention bank records to counsel prior to trial.

The petitioner testified that he received copies of his indictment for first degree murder but did not receive a copy of an indictment for burglary or aggravated burglary. He was never advised that he was charged with burglary or aggravated burglary. The petitioner said that counsel was ineffective because he did not file a motion to suppress "illegally seized items on a search warrant and an illegal search warrant itself[.]" He said that the search warrant was illegal because items were added to it after it was filled out, but counsel did not address it with the court.

The petitioner testified that counsel was ineffective because he did not investigate or talk to the residents of the apartment complex, nor did he request the field notes from Officer Cusic or Detective Becker "when they did their initial investigations to initial identification of who they saw." He knew that counsel did not investigate this because no one ever talked to him about it. The petitioner said that he did not see the State's witness list and was not

_____

[2] We attempt to limit our recitation of the testimony at the evidentiary hearing to that relevant to the issues on appeal.

aware of whom the State was calling to testify until the trial began. He did not know if any of the State's witnesses were interviewed by someone from the public defender's office. He admitted that he saw the witnesses' statements but was not told who was going to testify at trial.

The petitioner testified that counsel was ineffective because he did not fully investigate Elsie Fine's identification of him. He elaborated that a proper investigation would have shown that he was not even in the state so Fine "could not have identif[ied] [him] and heard [him] make an accusation that she claimed[.]" However, the petitioner admitted on cross-examination that counsel cross-examined Fine about the interaction she allegedly saw between the petitioner and his wife.

The petitioner testified that the prosecutor called him a liar several times during trial, and counsel did not object or raise it as an issue in the motion for new trial or on appeal. He recalled that the prosecutor made statements that "the defendant is a liar" and "this defendant lies caught up in lie after lie after lie don't believe him unless you have some corroboration." He said that counsel's failure to object was ineffective assistance of counsel, and the prosecutor's statements amounted to prosecutorial misconduct.

Counsel, an attorney practicing criminal law since 1977 and the district public defender for the 7th Judicial District, testified that his office was appointed to represent the petitioner when the petitioner's retained counsel was relieved of his representation. The petitioner was arraigned on April 22, 2005, and was served with a copy of the indictment at the arraignment. The assistant public defender assigned to the petitioner's case "had a dozen interviews and meetings with him" during the period she handled his case of arraignment until May 2006. When counsel took over the case, he and the petitioner "met very frequently" as well as met with their investigator "every week or ten days."

Counsel testified that the threat Fine "was supposed to have heard[] was one of the tougher issues" and that was "why [their] first witness[] was one of [the petitioner]'s employers from Kentucky named Mr. Bond, who testified the day he was supposed to be threatening his wife in the hospital parking lot he was in fact on the clock working up in Kentucky." He said that he learned about the petitioner's bank records between the trial and motion for new trial hearing. However, "the court of criminal appeals pohpohed how vital [Fine] was as a witness anyway since at trial she couldn't identify [the petitioner] or [his wife] from photographs." Counsel said that he rigorously cross-examined Fine without being "particularly mean to her," and he did not know of what greater proof he could have presented considering they "had a live witness [saying] that he could not have been in the hospital parking lot that day."

Counsel testified that the theory of defense at trial, upon the petitioner's insistence, was that the shooting was in self-defense. Counsel said that it was a tactical decision to not challenge the search warrant because what the officers "found in the search warrant was more helpful than harmful to us." Counsel stated that he did not request the officers' field notes because the officers did not testify about anything that would cause the notes to be helpful. Counsel said that he and the petitioner went over "every witness [they] knew about and what they would be expected to say." However, he would not have known for certain which witnesses the State was going to call and in what order they would testify.

Counsel testified that he did not object to the prosecutor's calling the petitioner a liar in her closing argument because he felt that "by calling him a liar, she [wa]s sounding more desperate and trying to highlight his testimony more than what the facts showed," and he thought the jury might pick up on that. He felt that if he objected and the court ruled right away, it would make the jury feel like "wow it must be important he is objecting to it." Asked on cross-examination why he did not feel that he needed to object to the prosecutor's saying that the petitioner was a liar, counsel reiterated that "our strategy was that there was no factual refutation of what [the petitioner] testified to and it would have distracted the jury from analyzing the facts[.]"

Counsel testified that the petitioner did not tell him about the bank records until after the trial. Asked on cross-examination when he first thought to investigate the petitioner's bank records, counsel responded, "When [the petitioner] remembered and it was after the trial[.]" Questioned about whether he should have asked the petitioner about his debit card use as part of his normal course of investigation, counsel said that "it wouldn't have come up about the debit card unless [the petitioner] would have brought it up because we had [the petitioner's employer] saying he [was working] in Kentucky on the day he was supposed[ly] . . . threatening his wife in the hospital parking lot."

Following the conclusion of the hearing, the post-conviction court denied the petition for post-conviction relief, finding that the petitioner failed to prove his claims by clear and convincing evidence. The court determined that counsel did not render deficient performance and that no errors prejudiced the defense.

## ANALYSIS

The petitioner argues that he received the ineffective assistance of counsel. He also argues that the trial court erred in dismissing his request for a copy of the transcripts of the opening and closing arguments so he could determine whether the original prosecutor engaged in prosecutorial misconduct.

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

## I. Ineffective Assistance of Counsel

The petitioner argues that trial counsel was ineffective for failing to: (1) procure bank records that would have shown he was out of the state during a time he was alleged to have threatened his wife at her place of employment; (2) raise "any and all issues related to felony murder" at the motion for new trial; and (3) timely object to the State's characterizations in its closing argument of him as a liar.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. Ordinarily, to establish that he was denied the effective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-12-

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

The prejudice prong of the Strickland test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

With regard to the bank records, the post-conviction court noted that the petitioner did not tell counsel about them and that, regardless, the bank records "make[] no difference" because Fine was equivocal on the date she supposedly saw the petitioner and Mrs. Seals arguing. Moreover, the petitioner raised the bank records as newly discovered evidence in his motion for new trial, as well as the trial court's refusal to grant a new trial on such basis in his direct appeal, and this court determined that the petitioner failed to show that the information would have changed the result of the trial. Phillip Douglas Seals, 2009 WL 55914, at *13-14. This court observed that the petitioner "testified at trial that he shot the victims multiple times and there is ample other evidence of premeditation other that the testimony of Ms. Fine . . . . [G]iven the overwhelming proof of [the petitioner]'s guilt, this information would not have changed the result of the trial." Id. at *14. The petitioner has failed to show that counsel was deficient in failing to procure the bank records for trial, as the petitioner never informed counsel about them, nor has the petitioner shown a reasonable probability that the result of the trial would have been different had the bank records been presented.

With regard to the petitioner's contention that counsel was ineffective for failing to raise issues related to felony murder in the motion for new trial, we note that the petitioner acknowledges that counsel raised this issue in the direct appeal but asserts that counsel did "not adequately address[]" the issue in the motion for new trial. He argues that the State's theory at trial was that he was engaged in aggravated burglary, but "the proof strongly suggested that [he] did have access to the apartment in which the killings occurred[.]" We note that on direct appeal this court addressed the petitioner's contention that he did not kill the victims during the perpetration of a felony and determined, after reviewing the proof, that "the jury was amply justified in finding [the petitioner] guilty of felony murder." Phillip Douglas Seals, 2009 WL 55914, at *10. Accordingly, we conclude that the petitioner has failed to prove that any alleged deficiency in counsel's performance caused him prejudice.

With regard to counsel not objecting to the State's characterizations of the petitioner as a liar, counsel's testimony, which was accredited by the post-conviction court, was that he felt that the State sounded desperate by calling the petitioner a liar and thought that the jury would pick up on that the State was trying to highlight the petitioner's testimony in order to distract it from analyzing the facts. Counsel thought that an objection would give the jury the impression that the State's comments were important and something to which it should pay close attention. We cannot conclude that this tactical strategy by counsel amounted to deficient performance. In addition, we note that the petitioner failed to provide any legal authority for his contention that the State's "comments related to the believability of the [petitioner] and that he was a liar[]" were objectionable and has therefore waived the issue. See Tenn. Ct. Crim. App. R. 10(b).

## II. Request for Transcripts

The petitioner also argues that the post-conviction court erred in denying his request for transcripts of the opening and closing arguments so he could determine whether the original prosecutor engaged in prosecutorial misconduct. However, we note that the petitioner's motion and argument on the motion only concerned the opening statement. In fact, his post-conviction counsel told the court during arguments on the motion: "Obviously we do have the closing statements . . . [and] we wanted to review the opening statements to see if there were any more derogatory remarks made by [the prosecutor][.]"

In any event, the court heard arguments concerning the petitioner's request at the start of the evidentiary hearing. Post-conviction defense counsel argued that the State referred to the petitioner as a liar during the trial and in the closing argument, but the record showed "that nowhere through the proceeding [the petitioner] lied about anything." He explained that "based on that we wanted to review the opening statements to see if there were any more derogatory remarks made by [the State] through voir dire and opening in reference to [the

petitioner.]" The State responded that the petitioner "essentially conceded that his motion has no merit insomuch that . . . they wanted to review the transcript to see if there was any prosecutorial misconduct." The State pointed out that the petitioner was present throughout the opening statement and that, if "any such statements were made, he should have alluded to them in the motion[.]" The State asserted that "a search for a possibility" was not a sufficient reason to grant the motion.

In ruling on the motion, the post-conviction court found as follows:

The motion for cassette tape of opening statements filed on or about January 4th, 2012 and another one was filed on January 11th, 2012, today is January 23rd. At best it was filed 19 days or 12 days prior to this hearing. The jury was instructed, I've reviewed the files, I've reviewed even jury instructions. The jury was instructed that any statement made by counsel is not proof. If the jury finds, or words to this effect, if the jury finds that any statement made by counsel is not supported by evidence, they are to disregard those statements. And again, or words to that effect, were given to the jury. [Post-conviction defense counsel]'s opening motion actually did concede that they wanted to see if there was any misconduct. We're here today on a post-conviction relief alleging not only prosecutorial misconduct but also defense counsel standard of performance being less than, being so deficient as to cause prejudice against the [petitioner], and simply a search for something else is not a valid basis for the motion. Even if it were, this jury had the opportunity to listen to and did listen to all of the evidence in this case and make a decision as to whether or not the opening statements which were used to tell the jury what they believed was going to be heard. The jury could have then made a decision as to whether those attorneys succeeded in presenting proof that was consistent with their opening statements or not, and I find that the motion is not well taken, and I deny the motion.

The record supports the post-conviction court's well-reasoned conclusion that the petitioner's motion was without merit, and the petitioner has not shown that he was prejudiced by the denial of his request. It appears as though the motion was a delay tactic to go on a "fishing expedition." The petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE